IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| GAYLA HOSMAN, | ) |
|       Plaintiff, | ) |
| vs. | ) CIVIL NO. 04-4093-JLF |
| MAYTAG CORPORATION, | ) |
|       Defendant. | ) |

**MEMORANDUM AND ORDER**

**FOREMAN, District Judge:**

Before the Court is defendant's motion for summary judgment (Doc. 27). Plaintiff has filed a response (Doc. 36) and defendant has filed a reply (Doc. 40).

**I.    Background.**

In 1983, plaintiff Gayla Hosman was originally hired by defendant Maytag's predecessor, Norge, and was laid off in 1986 (Doc. 28, Att. 4, Hosman Depo, p.5). In 1989, she was rehired as a dryer line assembler, and was employed until her termination on April 24, 2004. During her employment, plaintiff suffered three prior work-related injuries and was placed in temporary, but not permanent, light-duty positions to accommodate the restrictions that resulted from her injuries (Doc. 28, Att. 3, pp. 1-8).

In early October, 2000, plaintiff injured her right shoulder, arm, wrist, hand, and right upper extremity (Doc. 28, Att. 4, Hosman Depo, p.27). On October 5, 2000, plaintiff reported her injury to Mary Lou Baxter, Maytag's Human Resources representative (Doc. 28, Att. 4, Hosman Depo, p.39). On October 13, 2000, plaintiff was assigned to perform light-duty work (Doc. 28, Att. 1, p.4).

Plaintiff sought medical treatment from Dr. Mirly. Dr. Mirly performed surgery on

plaintiff's right arm and released her to light-duty work on June 29, 2001 (Doc. 28, Att. 4, Hosman Depo, pp.43-44). After the surgery, Dr. Mirly indicated that plaintiff should be assigned to light-duty work on a permanent basis (Doc. 28, Att. 4, p.3 of 13). From June 29, 2001 to February 2002, defendant continued to temporarily assign plaintiff to light-duty work, such as folding gloves, greasing pulleys, sweeping floors, data entry, and other similar duties (Doc. 28, Att. 4, Hosman Depo, p.56). The duties given to plaintiff changed from day to day, (Doc. 28, Att. 4, Hosman Depo, p.56), and were not permanent, full-time assignments.

Plaintiff's light-duty assignments sometimes involved the use of power drivers. Plaintiff told Dr. Mirly that using power drivers caused pain and swelling in her right hand. Dr. Mirly's medical records indicate that he and plaintiff,

> discussed consideration of job modifications or looking for possibly a different type of job. I think she needs to work this out and consider her type of work verses [*sic*] her discomfort.

*(Doc. 28, Att. 4, Hosman Depo, p.49-51).*

In late October and November, 2001, defendant undertook to review the work situations of all employees who had work restrictions, temporary or permanent (Doc. 28, Att. 2, p.3). Dr. Mirly had placed plaintiff on "permanent light duty" but he did not describe what he meant by "permanent light duty," and he did not identify the permanent restrictions that he placed on plaintiff (Doc. 28, Att. 2, p.3; Att. 4, p.7). As such, to clarify the permanent restrictions, defendant instructed plaintiff to see Dr. Bozorgzad. On November 6, 2001, Dr. Bozorgzad met with plaintiff. His notes state that:

> Gayla is here today because we are reviewing permanent and temporary restriction logs. Gayla has a restriction sheet from her doctor, Dr. Mirly that states that Gayla needs to be on light duty permanently. There is no definition of light duty included in Dr. Mirly's request. Gayla and I had a long talk today. Our goal is to define exactly what the requirements of light duty are as per Dr. Milry's note. My plan is to contact him. Today Gayla tells me that she does not think that he knows exactly what kind of light duty he wants. If that is the case I have told Gayla that we need to do a fit for work assessment. The reason is to see what kind of job we have in the plant that will be suited for Gayla's physical condition. I will contact Gayla after I talk to Dr. Mirly.

*(Doc. 28, Att. 4, p.5).*

The record does not indicate whether Dr. Bozorgzad followed up by contacting Dr. Mirly. On March 27, 2002, however, Marie Brasher, (Senior Worker's Compensation and Medical Services Specialist), called Dr. Mirly's office and asked a nurse to ask Dr. Mirly for a description of plaintiff's permanent restrictions (Doc. 28, Att. 4, p.7, labeled as Exh. 22). At some point, Dr. Mirly's office responded to Ms. Brasher's request by stating that Dr. Mirly would not see plaintiff anymore because she was a "no call," or a "no show for her final appointment" (Doc. 28, Att. 4, p.7). As such, Dr. Mirly referred plaintiff back to Dr. Golz (Doc. 28, Att. 4, p.7).

On April 23, 2002, plaintiff went to see Dr. Golz to clarify her physical restrictions (Doc. 28, Att. 1, p.5). After the examination, Dr. Golz stated:

> My formal recommendation would be that she be in sedentary light to light-duty status. This would allow her to lift 15 to 20 pounds occasionally, up to 8 to 10 pounds frequently. She is to do no repetitive lifting or repetitive activity involving her right upper extremity. She is to use no pneumatic tools involving her right upper extremity.

*(Doc. 28, Att. 1, pp.5-6).*

Thus, on April 23, 2002, Dr. Golz placed plaintiff on permanent restrictions. On April 24, 2002, plaintiff met with Ms. Brasher. Ms. Brasher checked with Maytag employee Karen White, to see what jobs were currently available (Doc. 28, Att.4, p.7, (labeled as Exh. 22)). Those jobs were: 1) washer line assembler, 2) dryer line assembler, 3) manual press operator, and 4) floor inspector (Doc. 28, Att.4, p.9, (labeled as Exh. 23)). Both Ms. Brasher and plaintiff spoke to the supervisors of these positions and determined that the first three jobs were not compatible with plaintiff's permanent restrictions. For example, the washer line job required repetitive movement, and the dryer line job required the use of an air gun (Doc. 28, Att.4, p.9, (labeled as Exh. 23)). Although plaintiff disagrees, defendant determined that the floor inspector position violated plaintiff's restrictions because it involved pushing and pulling a thirty-five pound cart five to six (5-6) times per day, and typing and doing data entry for up to an hour a day (Doc. 28, Att.4, p.9, (labeled as Exh. 23)). Ms. Brasher told plaintiff that Maytag "had no work available that met her restrictions." (Doc. 28, Att.4, p.7, (labeled as Exh. 22)).

On May 3, 2002, Ms. Brasher again checked with Karen White as to positions that might be available for plaintiff. Again, the positions that were open did not meet plaintiff's physical restrictions. (Doc. 28, Att.4, p.7, (labeled as Exh. 22)). That same day, Janice McConnaughy, from Maytag's Human Resources Department, gave plaintiff a termination slip that said plaintiff's termination was:

> due to lack of position within Maytag HLP that meets the restrictions that are now permanent restrictions.

*(Doc. 28, Att. 4, p.10, (labeled as Exh. 24)).*

Four days later, on May 7, 2002, plaintiff's attorney prepared a letter notifying Maytag that plaintiff filed a worker's compensation claim with the Illinois Industrial Commission (Doc. 28, Att.4, p.11, (labeled as Exh. 25)).

Plaintiff has sued defendant for retaliatory discharge in the Circuit Court, Williamson County, Illinois. Specifically, plaintiff claims that defendant terminated her in retaliation for exercising her worker's compensation rights. Defendant has removed the matter to this Court based upon diversity of citizenship and an amount in controversy over $75,000. Defendant's motion for summary judgment is discussed below.

## II.     **Summary Judgment Standard.**

Summary judgment is appropriate where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *FED.R.CIV.P. 56.* The initial burden of showing that no genuine issue of material fact exists is on the moving party. *Federal Deposit Ins. Corp. v. Meyer*, 781 F.2d 1260, 1267 (7th Cir. 1996). Once the moving party has demonstrated the absence of any genuine factual issues, the nonmoving party, to withstand summary judgment, must present specific facts showing that a genuine issue exists for trial. *FED.R.CIV.P. 56(e).* A genuine issue of material facts exists only where "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.,* 447 U.S. 242, 249 (1986).

## III.    **Discussion.**

To prevail on a retaliatory discharge claim in Illinois, plaintiff must show that: (1) she has been discharged; (2) in retaliation for the employee's activities; and (3) that the discharge

violates a clear mandate of public policy. *See Hartlein v. Illinois Power Co.*, 601 N.E.2d 720, 728 (1992). "More specifically, in a worker's compensation situation, a plaintiff must show that he or she: (1) was the defendant's employee before his or her injury; (2) exercised a right granted by the Worker's Compensation Act; and (3) was discharged from his or her employment with a causal connection to his or her filing a worker's compensation claim." *Tullis v. Townley Engineering & Mfg. Co., Inc.*, 243 F.3d 1058 (7th Cir. 2001) (*citing Kritzen v. Flender Corp.*, 589 N.E.2d 909, 915 (1992)). If the employer has a valid basis for discharging the employee, which is not pretextual, the element of causation is not met. *Hartlein*, 601 N.E.2d at 728.

Here, there is no dispute plaintiff was an employee before she was injured, (element one). The parties do dispute, however, whether elements two and three can be met. Specifically, defendant argues that plaintiff did not file her worker's compensation claim until *after* her discharge, thus, there can be no causal connection between the exercise of her rights and her termination. Although the Court ultimately agrees with defendant's conclusion that there is no evidence of a causal connection between plaintiff's exercise of her rights and her termination, defendant's analysis is not quite correct.

In the typical worker's compensation retaliatory discharge claim, plaintiffs usually allege that they were discharged because they filed, (or threatened to file), a worker's compensation claim. *See, e.g., Kelsay v. Motorola, Inc.*, 384 N.E.2d 353 (1978). As noted by plaintiff's counsel, however, Illinois cases hold that a plaintiff can also establish a retaliatory discharge claim if she can show that the employer's motive for discharging her

was to interfere with her exercise of *any* of her rights under the Worker's Compensation Act. *See e.g., Darnell v. Impact Industries, Inc.*, 473 N.E.2d 935, 937 (Ill. 1984) (plaintiff states a retaliatory discharge claim when alleging that employer discharged her for filing worker's compensation claims against former employer); *Wolcowicz v. Intercraft Industries Corp.*, 478 N.E.2d 1039, 1042 (Ill. App. 1st Dist.1985) (plaintiff states retaliatory discharge claim when alleging that employer discharged him for no cause and employer attempted to have plaintiff sign a waiver of all claims for work-related injuries); *cf. Burgess v. Chicago Sun-Times*, 476 N.E.2d 1284, 1287 (Ill. App. 1st Dist.1985) (plaintiff fails to state a cause of action for retaliatory discharge when there was not a single allegation in plaintiff's complaint that he intended to seek relief under the Act or that the defendant was informed, or in anyway found out, that the plaintiff was pursuing any remedy under the Act and the defendant went ahead and discharged him because of it). Thus, as plaintiff's counsel notes, a claim for retaliatory discharge in Illinois is not limited to those cases where plaintiff actually filed a worker's compensation claim prior to termination.

Nonetheless, to be able to show retaliatory discharge in Illinois, a plaintiff must set forth *some* facts from which it can be inferred that not only was he discharged, (or threatened with discharge), but also that the employer's "motive in discharging . . . him was to deter him from exercising his rights under the Act or to interfere with his exercise of those rights." *Horton v. Miller Chemical Co.*, 776 F.2d 1351, 1356 (7th Cir. 1985). Here, the Court cannot find facts sufficient to create such an inference.

Plaintiff argues that although she did not file her worker's compensation claim until

after termination, Maytag had notice of a "potential" worker's compensation claim because Maytag knew that plaintiff had been injured at work, was seeking medical treatment, and was incurring medical expenses that would need to be reimbursed through the worker's compensation system.  Plaintiff also argues that Maytag was fully aware that plaintiff was exercising her worker's compensation rights because it paid for her surgery related to the work injury, and from June 2001 and April 2002, it provided modified work instead of paying temporary total disability benefits under the Act.  Plaintiff argues that by putting her on modified duty to avoid paying temporary total disability payments, defendant clearly had actual and constructive notice of her claim for worker's compensation benefits.

Plaintiff appears to be making an argument of "preemptive termination," in other words, that defendant knew plaintiff was going to file a worker's compensation claim and terminated her before she had a chance to do so, to avoid any appearance that her termination was related to the filing of her claim.  Although plaintiff is correct that a claim need not have been filed to support a retaliation discharge claim, as noted, there must be some evidence that defendant's motive when terminating her was to deter her from exercising her rights under the worker's compensation act.  Here, plaintiff was injured in early October, 2000. Defendant continued to employ her until May 3, 2002, or more than a year and a half later. The United States Court of Appeals for the Seventh Circuit has held that in the absence of other evidence of a causal link, a lengthy time delay between notice of, or filing the claim and termination is insufficient proof of causation.  *See e.g., Fyfe v. City of Fort Wayne,* 241 F.3d 597 (7th Cir. 2001) ("In order to establish a causal connection via mere temporal

proximity, the employer's adverse action must follow fairly soon after the employee's protected conduct.") (*citing Hughes v. Derwinski*, 967 F.2d 1168, 1174-75 (7th Cir.1992) (four months insufficient); and *Juarez v. Ameritech Mobile Communications, Inc.*, 957 F.2d 317, 321 (7th Cir.1992) (six months insufficient)). Furthermore, the plaintiff in this case had suffered prior work injuries, and filed three worker's compensation claims without being terminated or without suffering any other adverse employment action. *See Loberg v. Gordon Flesch Co.*, 2004 WL 2973742 at *4 (N.D.Ill. Nov. 29, 2004) (evidence of plaintiff's previous worker's compensation claims, and defendant's lack of response to those claims, (i.e., no retaliation), is relevant to defendant's motive for terminating plaintiff). For these reasons, the Court finds that plaintiff cannot establish the required element of causation, and cannot therefore establish a prima facie case of retaliation.

Plaintiff claims that defendant, (specifically Mr. Townsend), admitted that it put plaintiff in a modified work position to save money on its worker's compensation program by alleviating its duty to pay temporary total disability (TTD) as required by the Illinois Worker's Compensation Act. Plaintiff also claims that Mr. Townsend admitted that once he determined that plaintiff was no longer eligible for TTD benefits, Townsend made her immediately choose between taking a job that was within her permanent restrictions or being terminated. Finally, plaintiff claims that defendant's new policy of making employees find permanent work within their restrictions was applied only to plaintiff and not to other employees.

Initially, the Court notes that plaintiff has not attached the relevant portions of Mr.

Townsend's depositions, so the Court cannot review Mr. Townsend's alleged admissions. Furthermore, even if Townsend did admit that plaintiff was put in a modified work program to save money on its worker's compensation program, this admission does not in and of itself show that defendant had a retaliatory motive. According to plaintiff, Section 8 of the Illinois Worker's Compensation Act provides that "an employer shall pay necessary and reasonable expenses for the care and treatment of work-related injuries and shall pay temporary total disability benefits if the employer cannot provide work within the temporary physical restrictions." (Doc. 37, p.7). Here, defendant did provide work within the temporary physical restrictions. There is no requirement, however, that defendant displace another worker in order to give permanent work to an employee who has permanent restrictions. *Hartlein*, 601 N.E.2d at 728 ("Illinois law does not obligate an employer to retain an at-will employee who is medically unable to return to his assigned position) (*citing Horton v. Miller Chemical Co.,* 776 F.2d 1351 (7th Cir.1985); ("nor is an employer obligated to reassign such an employee to another position rather than terminate the employment") (*citing LaPorte v. Jostens, Inc.,* 572 N.E.2d 1209 (1991)). Finally, with regard to plaintiff's allegations that she was singled out for this treatment, defendant has submitted an affidavit from Marie Brasher stating that defendant has identified five other employees who are being placed in the program (Doc. 40, Att. 2, p.2). For these reasons, plaintiff's arguments in this regard are to no avail.

Finally, plaintiff claims that she would have been able to work as a floor inspector but defendant refused to place her in that position. Plaintiff also claims that even though Ms. Brasher did not have authority to terminate employees, she immediately fired plaintiff after

learning that no open positions existed for which plaintiff was qualified. Lastly, as evidence of pretext, plaintiff argues that when questioned, Brasher could not identify the floor inspector position qualifications and/or why it was determined that plaintiff could not do the job.

Initially, the Court notes that although plaintiff may have construed Ms. Brasher's comments that plaintiff was being terminated, this is not what the record shows. What the record shows is that Ms. Brasher sought to identify the positions for which plaintiff might be qualified and determined that there were none. Brasher then informed plaintiff that there were no jobs available that met plaintiff's permanent restrictions. Although plaintiff may have construed this as being told that she was fired, the record shows that plaintiff's actual termination did not occur until Janice McConnaughy gave plaintiff the termination slip on May 3, 2002. Indeed, Brasher testified that she did *not* tell plaintiff that she was being terminated (Doc. 40, Att., Depo of Ms. Brasher, p.55). Furthermore, whether or not Brasher could recall the qualifications for the floor inspector position is not evidence of pretext. "Pretext . . . means a lie, specifically a phony reason for some action." *Plair v. E.J. Brach & Sons, Inc.*, 105 F.3d 343, 348 (7th Cir. 1997) (*quoting Russell v. Acme-Evans Co.*, 51 F.3d 64, 68 (7th Cir. 1995)). Here, the record shows that Dr. Golz placed permanent restrictions upon plaintiff of allowing her to lift 15 to 20 pounds occasionally, up to 8 to 10 pounds frequently, and not allowing her to do any repetitive activity involving her right upper extremity. The record also shows that the floor inspector position involved pushing a cart weighing approximately thirty-five pounds six times during an eight-hour work day and

keyboard typing and data entry for an hour a day.  The typing and data entry requirements are certainly repetitive activities that are prohibited by Dr. Golz's restrictions, and pushing a thirty-five pound cart could certainly be viewed as either prohibited by, or inconsistent with, plaintiff's lifting restrictions.  Under these circumstances, the Court cannot find that defendant's articulated reason for terminating plaintiff was pretextual.     Based on the above, plaintiff cannot show a *prima facie* case of retaliatory discharge.  Even if plaintiff could make a *prima facie* case, defendant has articulated a legitimate, non-retaliatory reason for her termination, and plaintiff has not come forth with facts sufficient to show that this reason is pretextual.  Accordingly, defendant's motion for summary judgment is granted.

IV.   **Summary.**

Based upon the above, defendant's motion for summary judgment (Doc. 27) is **GRANTED**.  Defendant's motion to strike (Doc. 39) is **MOOT**.  Judgment shall be entered against plaintiff and in favor of the defendant.  The Clerk of the Court shall enter Judgment accordingly.

**IT IS SO ORDERED.**
**DATED:  September 26, 2005.**

        *s/ James L. Foreman*
        **DISTRICT JUDGE**